UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMERICAN AUTOMOBILE INSURANCE
COMPANY,

                                        Plaintiff,

                    -against-                                              08 Civ. 6488 (LAK)

ADVEST, INC.,

                                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/28/09

**MEMORANDUM OPINION**

                Appearances:

                                Concepcion Montoya
                                Douglas A. Johns
                                Paulette S. Sarp
                                HINSHAW & CULBERTSON LLP
                                *Attorneys for Plaintiff*

                                Angela M. Scafuri
                                BRESSLER, AMERY & ROSS
                                *Attorneys for Defendant/Counterclaimant*

LEWIS A. KAPLAN, *District Judge.*

                Advest, Inc. ("Advest"), a registered broker-dealer, counterclaims against plaintiff,

American Automobile Insurance Company ("AAIC") for damages and a declaration that Advest is

entitled to coverage under AAIC Insurance Policy No. 8-17 ME 07318171 for Advest's costs of

2

defending and settling a lawsuit brought against it. AAIC argues that the underlying lawsuit's claims fall within various policy exclusions and that Advest failed to comply with a condition precedent to coverage. Advest rejoins that these provisions do not apply and, in any event, that AAIC is precluded from asserting them. AAIC moves for summary judgment dismissing the counterclaim.[1]

*Facts*

*The Wetter Conviction*

On August 17, 2005, Richard Wetter, a former employee of Advest, pleaded guilty to conspiracy to commit securities and bank fraud, as well as to substantive counts of securities fraud, bank fraud, and commercial bribery.[2] According to the indictment, Wetter paid kickbacks

t o

---

[1]

AAIC brought this action for a declaration that it had no duty to defend or indemnify Advest with respect to the underlying lawsuit.

The decision whether to issue a declaratory judgment is within the Court's discretion. *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). Declaratory relief is appropriate where an actual controversy exists and a declaration would "serve a useful purpose in clarifying or settling the legal issues involved." *Id.* (citing *Broadview Chem. Corp. v. Localite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1991). Where, however, the dispute may be resolved in a direct action for coercive relief, courts may dismiss the declaratory judgment complaint. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2d Cir. 1993) ("Where a district court has before it a declaratory judgment action and a direct action containing all of the issues in the declaratory judgment action, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint."). As Advest's counterclaim against AAIC, which seeks damages, fully encompasses all of the issues in AAIC's declaratory judgment complaint, the Court treats AAIC's motion for summary judgment on its declaratory judgment claim as a motion for summary judgment dismissing Advest's counterclaim.

[2]

AAIC Rule 56.1 St. ¶¶ 10-11.

employees of, among others, BNP Paribas ("BNP").[3]  In exchange, the employees placed orders with Wetter for treasury notes and bonds at above-market prices and also placed and cancelled interest rate swap transactions, causing BNP to pay Advest cancellation fees.[4]  BNP sought coverage for these losses from its insurer, National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union").[5]

*The Underlying Litigation*

On December 18, 2006, National Union, as BNP's subrogee and assignee, sued Advest (the "National Union Complaint") for damages that BNP had incurred as a result of Wetter's fraudulent scheme.[6] The National Union Complaint contained six causes of action arising from Wetter's actions: conversion, fraud, breach of contract, monies wrongfully had and received, unjust enrichment, and indemnification and contribution.

Advest appeared in the action on January 8, 2007 but did not notify AAIC of the suit until it forwarded the complaint on July 27, 2007, more than seven months later.[7]  On August 3, 2007,  Lancer Claim Services, Inc. ("Lancer"), which administered the claim for AAIC, wrote to

---

[3]

Indictment ¶¶ 7, 12-13, *United States v. Wetter*, 04 Crim. 0634 (NRB) (S.D.N.Y. June 30, 2004).

[4]

*Id.* at ¶ 7.

[5]

AAIC Rule 56.1 St. ¶ 14.

[6]

*Id.*

[7]

*Id.* ¶ 15; Advest Rep. Rule 56.1 St. ¶ 15.

4

Advest about the claim, which it later investigated.[8]  Lancer again wrote to Advest on September

5 and September 20, 2007 to "check in" and determine whether Advest was satisfied with Lancer's

administration of the claim.[9]

On December 17, 2007, Lancer acknowledged receipt of the complaint and agreed

to defend Advest subject to a full reservation of rights to deny coverage.[10]  On January 3, 2008,

Advest[11] advised Stacey McMahan, Lancer's director of financial services, that Advest was "close

to settling the matter" with National Union and asked if AAIC needed any additional forms from

Advest.[12]  McMahan replied that she was "not aware of any forms" that needed to be submitted prior

to settling, but that she would "get back to" Advest.[13]  On January 25, 2008, Advest sent Lancer a

case summary.[14]  On May 23, 2008, it notified AAIC and its agents by voicemail and e-mail that it

and National Union had agreed in principle to settle the underlying case for $1.6 million.[15]  The

---

[8]

Delmonico Aff. Ex. 4, at AAIC II 00275.

[9]

AAIC Rule 56.1 St. ¶ 22; Johns' Aff. Exs. 35-36.

[10]

Johns' Aff. Ex. 7, at ADVEST 0000144, 146-48, 151-52.

[11]

Jill Delmonico sent the communication on behalf of Advest. At the time, Delmonico was counsel in Global Wealth Management Litigation at Merrill, Lynch, Pierce, Fenner and Smith, Inc.  According to her affidavit, Advest is a wholly-owned subsidiary of Advest Group, Inc., which is a wholly-owned subsidiary of Merrill Lynch & Co.  Delmonico Aff. ¶ 4.

[12]

Delmonico Aff. Ex. 48, at ADVEST 00002045.

[13]

*Id.*

[14]

AAIC Rule 56.1 St. ¶ 19.

[15]

*Id.* at ¶ 20.

settlement was consummated some time later.[16]          On July 17, 2008, AAIC denied

coverage for Advest's settlement because, among other reasons, Advest had settled the claim

without AAIC's consent.[17]

*The Relevant Policy Provisions*

      In relevant part, Advest's AAIC insurance policy provides that:

> "The Company shall pay that portion of the ULTIMATE NET LOSS,
> in excess of the RETAINED AMOUNT, which the INSURED becomes
> legally obligated to pay as DAMAGES, and DEFENSE COSTS as a result
> of any CLAIM first made against the INSURED prior to the end of the
> POLICY PERIOD . . . for any WRONGFUL ACT of the INSURED in the
> performance of the INSURED'S PROFESSIONAL SERVICES, provided:
> . . .
>
> > 3.    prior to the inception date of the first Securities
> > Broker/Dealer Professional Liability Policy  issued and
> > continuously renewed by the Company to the NAMED
> > INSURED, no INSURED had knowledge of any
> > WRONGFUL ACT that could reasonably be expected to
> > result in a CLAIM . . . ."[18]

It provides further, however, that "[n]either the Company nor the INSURED may compromise or

settle any CLAIM in excess of the RETAINED AMOUNT arising from a WRONGFUL ACT to

which this insurance applies, without the written consent of the other."[19]

---

[16]

    *Id.* at ¶ 21.

[17]

    *Id.* at ¶ 25.

[18]

    Delmonico Aff. Ex. 2, at AAIC II 00050.

[19]

    *Id.* at AAIC II 00051

The policy contains a number of specific exclusions.  Among them are these:

"This policy does not apply to any CLAIM, including CLAIMS against the INSURED for failure to SUPERVISE, or any DAMAGES based upon any such CLAIMS, arising out of, attributable to, related to, or in any way connected with:

"A.     (1) any in fact dishonest, fraudulent, criminal or intentional act; or (2) the intentional non-compliance with, or violation of, any statute, rule or regulation . . . ;   However, this exclusion shall not apply unless there is a judgment, final adjudication or admission by the INSURED or ADDITIONAL INSURED establishing that the INSURED or ADDITIONAL INSURED committed such conduct.

"B.     activities through which the INSURED or ADDITIONAL INSURED gained in fact any personal profit or advantage to which the INSURED was not legally entitled, including, but not limited to, the commingling or unauthorized use of client funds, commission disputes, or the inability or refusal of the INSURED or ADDITIONAL INSURED to pay or collect premium, claim or tax monies . . . ;

"The act of any INSURED shall not be imputed to any other INSURED for purposes of determining the applicability of Exclusions A. and B."

*Discussion*

A.     *Legal Standard*

A motion for summary judgment will be granted only if the moving party shows that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.[20]  In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all

---

[20]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008); *see also* FED. R. CIV. P. 56(c).

7

reasonable inferences in favor of the nonmoving party.[21]  Where the burden of proof at trial would fall on the nonmoving party, however, it ordinarily is sufficient for the movant to point to a lack of evidence on an essential element of the nonmovant's claim.[22]  In that event, the nonmoving party must come forward with admissible evidence[23] sufficient to raise a genuine issue of fact for trial or suffer an adverse judgment.[24] And where the nonmoving party relies upon an affirmative defense to defeat summary judgment, it "must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense."[25] On this motion, therefore, AAIC has the burden of adducing evidence that the National Union Complaint falls within a policy exclusion.[26] "This burden is heavy" to the extent that the insurer is seeking to avoid the duty to defend.[27]

---

[21]

See *Anderson*, 477 U.S. at 255.

[22]

See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[23]

See, e.g., *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001).

[24]

See, e.g., *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

[25]

*Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 385 (S.D.N.Y. 1998) (quoting *Frankel v. ICD Holdings S.A.*, 930 F. Supp. 54, 65 (S.D.N.Y. 1996)).

[26]

See *New York v. Blank*, 27 F.3d 783, 788 (2d Cir. 1994) ("[T]he insurer bears the burden of proving that an exclusion applies.") (citing *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 654, 593 N.Y.S.2d 966, 973 (1993)).

[27]

*Id.* at 789.

B. *Exclusions*

　　　AAIC does not deny that it issued the insurance policy to Advest, that Wetter was a "Registered Representative" of Advest as defined under the policy, or that the policy covered both Advest and Wetter.[28]  It nevertheless argues that it had no duty to defend or indemnify Advest for the claims in the National Union Complaint because "there [wa]s no possible factual or legal basis" for considering that the policy required it to do so.[29] It contends that the policy excluded the claims because (1) Advest knew of National Union's potential claim before the inception date of the policy, (2) Wetter's actions were fraudulent, and (3) Advest earned "improper personal profit" as a result of Wetter's scheme.  As I conclude that the claims in the National Union Complaint fall under the first and third exclusions, it is unnecessary to discuss the second.[30]

　　　Under New York law, an insurer's duty to defend is broader than its duty to indemnify.[31]  To avoid their duty to defend based on an exclusion clause, "the insurer must demonstrate that there is no reasonable possibility of coverage under the policy"[32] by showing that the allegations in the underlying complaint are entirely within the policy exclusion.[33]  Ambiguities

---

[28]　　Compl. ¶ 9; AAIC Rule 56.1 St. ¶¶ 28-29.

[29]　　AAIC Br., at 6.

[30]　　Given this conclusion, it is also unnecessary to address AAIC's additional argument that Advest failed to obtain its written consent, as the policy requires, prior to settlement.

[31]　　*Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 655, 593 N.Y.S.2d 966, 974 (1993).

[32]　　*See Blank*, 27 F.3d at 789.

[33]　　*Int'l Paper Co. v. Cont'l Cas. Co.*, 35 N.Y.2d 322, 325, 361 N.Y.S.2d 873, 875 (1974).

in the policy are construed in favor of the insured.[34]  If the "allegations on their face, do not bring the case within the coverage of the policy, there is no duty to defend or indemnify."[35]

1.    *Advest's knowledge of the National Union Claim prior to January 1, 2005*

AAIC argues that it was not obligated to defend and is not obligated to indemnify Advest with respect to the National Union Complaint because Wetter's scheme constituted a "WRONGFUL ACT" of which Advest knew no later than December 13, 2004, prior to the January 1, 2005 policy inception date.

The AAIC Policy provides that AAIC "shall pay that portion of ULTIMATE NET LOSS"[36] that Advest becomes obligated to pay from claims covered by the policy "provided [that] . . . prior to the inception date of the first Securities Broker/Dealer Professional Liability Policy issued and continuously renewed by the NAMED INSURED, no INSURED had knowledge of any WRONGFUL ACT that could reasonably be expected to result in a CLAIM."[37]  A "WRONGFUL

---

[34]

*New York v. Blank*, 27 F.3d 783, 788 (2d. Cir. 1994).

[35]

*Tartaglia v. Home Ins. Co.*, 240 A.D.2d 396, 396, 658 N.Y.S.2d 388, 390 (2d Dep't 1997) (citing *Lionel Freedman, Inc. v. Glenn Falls Ins. Co.*, 27 N.Y.2d 364, 368, 318 N.Y.S.2d 303, 306 (1971).

[36]

"'ULTIMATE NET LOSS' means all sums actually paid, or which the INSURED is obligated to pay, as DAMAGES and defense costs in satisfaction of claims or suits for which insurance is afforded under this policy[.]" Delmonico Aff. Ex. 2, at AAIC II 00055. "'DAMAGES' means monetary damages, judgments, settlements and DEFENSE COSTS." *Id.* at AAIC II 00053.  It excludes (1) amounts not insurable under the law, (2) punitive or exemplary damages, (3) fines or penalties imposed by law, (4) "attorneys' fees incurred by the prosecution of any CLAIM which may be imposed against the INSURED or ADDITIONAL INSURED," and (5) the return of commissions, fees, charges or other forms compensation received or owed by the insured or additional insured. *Id.*

[37]

Delmonico Aff. Ex. 2, at AAIC II 00050.

ACT" includes "any actual or alleged breach of duty, negligent act, error, omission, misstatement or misleading statement by an INSURED or ADDITIONAL INSURED."[38]

It is undisputed that the National Union Complaint alleges "wrongful acts" within the meaning of the policy.[39]  It is undisputed also that Wetter was an "insured" within the meaning of the policy and that the policy's coverage began on January 1, 2005.[40]  Finally, there is no genuine issue of material fact that Advest knew of Wetter's acts no later than December 13, 2004 and reasonably expected that they could result in a claim.[41]  In the NASD claim it filed that day, Advest described Wetter's scheme and twice stated that his acts "caused Advest considerable damage, including . . . the prospect of possible liability exposure to BNP."[42]  The undisputed facts therefore show that Advest knew about Wetter's "wrongful acts" before the inception of the policy.  Thus, the causes of action in the National Union Complaint, which stemmed from Wetter's acts, are not covered under the policy.[43]

---

[38]

*Id.* at AAIC II 00055.

[39]

Countercl. ¶ 8.

[40]

AAIC Rule 56.1 St. ¶ 28.

[41]

AAIC Rule 56.1 St. ¶ 13.  Indeed, the evidence suggests that Advest knew about Wetter's "wrongful acts" as early as October 27, 2004.  Johns' Aff. Ex. 43, at 79.

[42]

Johns' Aff. Ex. 32, at ADVEST II 0000248-49.

[43]

Advest's unsupported statements about its compliance with "disclosure obligations prior to the inception of the AAIC Policy," a BNP employee's equal involvement in Wetter's scheme, AAIC's "review of Advest's claims history," and the FBI's investigation do not create a genuine issue of material fact.  *See* Advest Br. at 12-15.  The policy's language is clear: AAIC has an obligation to pay "provided . . . [that] prior to the inception date [of the policy] no INSURED had knowledge of any WRONGFUL ACT that could reasonably be expected to result in a CLAIM."  Delmonico Aff. Ex. 2, at AAIC II 00050.  Since the

2.    *The "improper personal profit" exclusion*

AAIC next argues that it had no obligation to defend or indemnify Advest with respect to the National Union Claim because it fell within the policy's "improper personal profit" exclusion.  This provision excluded from coverage any claim "arising out of, attributable to, related to, or in any way connected with . . . activities through which the INSURED . . . gained in fact any personal profit or advantage to which the INSURED was not legally entitled . . . ."[44]

The undisputed evidence shows that Advest, an insured, earned money from Wetter's fraudulent trades with BNP.  Each treasury note and bond trade generated a commission, of which Advest received sixty percent.[45]  Furthermore, Anthony Morgan, Advest's corporate representative, testified at his deposition that he believed Advest "would have made some profit" from Wetter's dealings with BNP.[46]  The claims in the National Union Complaint undoubtedly are "connected with" the money Advest earned from Wetter's scheme.  Each alleges that Advest earned a "substantial profit" and "received a significant amount of funds" as a result of the fraudulent

---

undisputed evidence shows that Advest knew of the wrongful acts prior to the inception date, AAIC had no obligation to defend or indemnify claims that arose from the act.

[44]   Delmonico Aff. Ex. 2, at AAIC II 00056.

[45]   AAIC Rule 56.1 St. ¶¶ 11-12.

[46]   *Id.* at ¶ 10; Johns' Aff. Ex. 43, at 23-24.

transactions.[47]  The claims therefore fall within the policy exclusion.[48]


C.     *Equitable Estoppel and Laches*

Advest nevertheless contends that AAIC is equitably estopped to deny, or barred by laches from denying, duties to defend and indemnify based on the policy's prior knowledge or improper personal profit provisions because AAIC unreasonably delayed in denying coverage. Equitable estoppel arises when one party prejudicially changes position in justifiable reliance on the conduct of another.[49]   Laches is "an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party,"[50] prejudice being an essential element of the defense.[51]

Neither equitable estoppel nor laches applies with respect to AAIC's duty to defend

---

[47]

Johns' Aff., Ex. 6 ¶¶ 8-15.

[48]

See *Bistricer v. Fed. Ins. Co.*, No. 02 Civ. 5366 (JSR), 2003 WL 22251290, at *3 (S.D.N.Y. Sept. 30, 2003).  The policy's non-imputation clause does not change this result since Advest *itself* earned profits that it was not legally entitled to and that are connected with the National Union claims.

[49]

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 668  (1982); *Metropolitan Life Ins. Co. v. Childs Co.*, 230 N.Y. 285, 292 (1921) ("An estoppel rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury."); *Draper v. Oswego Co. Fire Relief Assoc.*, 190 N.Y. 12, 16 (1907) ("The doctrine of equitable estoppel . . . is that a party may be precluded by his acts and conduct from asserting a right to the detriment or prejudice of another party who, entitled to rely on such conduct, has acted upon it.").

[50]

*Saratoga Co. Chamber of Comm., Inc. v. Pataki*, 100 N.Y.2d 801, 816, 766 N.Y.S.2d 654, 662 (2003) (citing *Matter of Barabash*, 31 N.Y.2d 76, 81, 334 N.Y.S.2d 890, 894 (1972).

[51]

*Id.*

or indemnify Advest for the National Union Complaint.  In asserting its equitable defenses, Advest

makes generalized arguments about AAIC's delay, including repeated arguments that AAIC knew

about its settlement negotiations but "never even offered . . . a caution to Advest of a possible

coverage denial."[52]  Advest, however, points to no evidence that AAIC led it to believe it would not

assert any applicable policy provisions to deny coverage.  To the contrary, AAIC expressly reserved

its rights to deny coverage based on, among other things, the prior knowledge and improper personal

profit exclusions.[53]  Advest acknowledges that it received this reservation of rights.[54]  Advest

therefore can not establish estoppel or laches.

*Conclusion*

For the foregoing reasons, AAIC's motion for summary judgment [DI 38] dismissing

Advest's counterclaim [DI 11] is granted.  Advest's motion for summary judgment [DI 43] is

dismissed as moot and the complaint [DI 1] is dismissed.

SO ORDERED

Dated:  October 28, 2009

_____
Lewis A. Kaplan
United States District Judge

---

[52]    *E.g.*, Advest Br. 18-20.

[53]    Johns' Aff. Ex. 7, at ADVEST 0000141, 151-52.

[54]    Delmonico Aff. ¶¶ 30-31.